# STATE OF CONNECTICUT *v.* WILLIAM TORRES
## (AC 28876)

Gruendel, Harper and Beach, Js.

Argued September 26—officially released December 16, 2008

*Laljeebhai R. Patel*, for the appellant (defendant).

*Raheem L. Mullins*, deputy assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Stephen M. Carney*, senior assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, William Torres, appeals from the judgment of conviction, rendered after a jury trial, of larceny in the third degree in violation of General Statutes § 53a-124 (a) (2) and forgery in the third degree in violation of General Statutes § 53a-140.[1] The defendant claims that the evidence was insufficient to sustain a conviction as to either of these crimes. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On September 14, 2005, the defendant opened a savings account at the Jewett City branch of Eastern Federal Bank. The defendant opened the account with an initial deposit of $25, the minimum deposit for the account. Eastern Federal Bank, in compliance with federal banking regulations, may place a hold on transactions involving checks. That is, with regard to funds deposited by check, the bank may delay the availability of these funds for withdrawal. In the case of checks drawn on a local bank, the hold may be up to two days. For checks drawn on an out-of-state bank, the hold may be up to five days. For checks in amounts exceeding $5000, the hold may be up to nine days. Independent of these holds, for any deposits made via an automated teller machine (teller

---

[1] The court sentenced the defendant to a term of incarceration of five years, execution suspended after forty months, followed by one year of probation with special conditions, including payment of $5000 in restitution.

machine), there is an automatic one day hold. At the time that the defendant opened his account, it was customary for banks to convey these banking regulations to new account holders.

During the next several weeks, the defendant deposited and withdrew funds from his account. This activity included deposits in the amounts of $20, $40 and $150, as well as withdrawals in similar amounts. At approximately 1:23 p.m. on November 9, 2005, the defendant deposited a cashier's check, in the amount of $5000, into his account via a teller machine at a Norwich branch of Eastern Federal Bank. The teller machine was located adjacent to the front door of the bank, which was open for business at that time. The check was drawn on Chevy Chase Bank in Bethesda, Maryland, and made payable to Luis Almodovar. The back of the check was endorsed with Almodovar's signature.[2]

In compliance with the aforementioned banking industry regulations, Eastern Federal Bank placed a five day hold on the transaction, making the funds available for withdrawal on November 15, 2005, at the earliest. At approximately 9:09 a.m., on November 15, 2005, the defendant presented proper identification and a withdrawal slip in the amount of $5000 to a bank teller at Eastern Federal Bank. The teller delivered these funds to the defendant.

On November 22, 2005, one week after the withdrawal, Chevy Chase Bank returned the cashier's check to Eastern Federal Bank with a notation that it was a counterfeit check. Within days, Eastern Federal Bank mailed the defendant a letter at the mailing address he listed on the documents he submitted to the bank when he opened the account weeks earlier. The letter stated that the $5000 check had been returned, a fee of $10

[2] Under Eastern Federal Bank policies, an account holder may deposit in his or her account a check made payable to a third party.

had been assessed to the defendant's account and his account had a $5003.73 negative balance. The letter also provided a telephone number for the defendant to call with any questions concerning the matter. The bank did not receive any response from the defendant, and a bank employee notified the police. After the defendant withdrew the $5000 from his account on November 15, 2005, he did not engage in any further transactions concerning this account.

At trial, the state presented the testimony of Norwich police Officer Mark Lounsbery. Lounsbery testified that he had specialized training in the field of financial crimes and had investigated during the course of his law enforcement career approximately 100 cases in which persons had presented fraudulent documents to banks in the guise of presenting valid negotiable instruments. The jury reasonably could have found that in December, 2005, Lounsbery began to investigate the bank's complaint concerning the defendant. After confirming that the address that the defendant provided to the bank was the defendant's current address, Lounsbery called the defendant. He left a message on the defendant's answering machine in which he identified himself and explained the nature of his call. The defendant did not return Lounsbery's call, and Lounsbery subsequently applied for a warrant for the defendant's arrest.

In February, 2007, approximately three weeks prior to the defendant's trial in the present case, the defendant appeared at the office of Shirley Mostowy, the manager of two Norwich branches of Eastern Federal Bank. The defendant told Mostowy that he had received the $5000 check from his stepson, Luis Almodovar, and that he had been unaware that he owed the bank any money. The defendant stated that he was scheduled to appear in court in a few weeks and inquired whether he could enter a payment program or agreement with the bank concerning the $5000. The defendant explained that "he

wanted to have something in place" by the time he appeared in court that would demonstrate that he was "making amends" for this incident. The defendant also told Mostowy that he was prepared to pay the bank $100 at that time. Additional facts will be discussed as necessary.

The defendant claims that the evidence did not support his conviction with regard to either of the crimes with which he stands convicted. The defendant acknowledges that he did not preserve this claim at trial. He seeks review under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine codified in Practice Book § 60-5. The claim, however, is reviewable absent resort to either of these doctrines. As this court has observed, "[a]ny defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. Accordingly, we conclude that no practical reason exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Internal quotation marks omitted.) *State* v. *Brown*, 90 Conn. App. 835, 838, 879 A.2d 466, cert. denied, 276 Conn. 901, 884 A.2d 1026 (2005).

"[T]he [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). "In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt

beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Silva*, 285 Conn. 447, 454, 939 A.2d 581 (2008). Having set forth the general principles that govern our review of the claim, we next consider the claim as it relates to each crime at issue.

## I

To convict the defendant of forgery in the third degree, as the commission of that crime is alleged in

the state's substitute information, the state bore the burden of proving beyond a reasonable doubt that he (1) acted with the intent to defraud another, (2) possessed a written instrument and (3) knew such written instrument was forged.[3] See General Statutes § 53a-140 (a). The defendant does not argue that the state did not prove beyond a reasonable doubt that he acted with the intent to defraud another or that he possessed a written instrument, the cashier's check. The defendant argues that the state failed to prove beyond a reasonable doubt that he knew that the check was a forgery.

"A person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such nature or that such circumstance exists . . . ." General Statutes § 53a-3 (12). " '[K]nowingly' ordinarily means 'with awareness' . . . and . . . 'knows' means 'to have cognizance, consciousness, or awareness.' " (Citation omitted.) *State* v. *Jackson*, 13 Conn. App. 288, 292, 535 A.2d 1327 (1988). Knowledge, like intent and purpose, describes a particular state of mind. *State* v. *Sorabella*, 277 Conn. 155, 198, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). "The state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proved by circumstantial evidence . . . and is, except in rare cases, a question of fact. . . . Intention is a mental process which, of necessity, must be proven either by the statements or the actions of the

---

[3] A "forged instrument" is defined by statute as "a written instrument which has been falsely made, completed or altered." General Statutes § 53a-137 (7).

person whose conduct is being examined. . . ." (Internal quotation marks omitted.) *State* v. *Mish*, 110 Conn. App. 245, 261–62, 954 A.2d 854, cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008). "[I]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Williams*, 110 Conn. App. 778, 791–92, 956 A.2d 1176 (2008).

As discussed previously, the state presented evidence from which the jury reasonably could have found that the defendant opened a bank account with the minimum deposit of $25, banks customarily provide new account holders with information concerning bank regulations that apply to the availability of funds deposited by check, the defendant conducted a number of transactions involving the account during the following weeks and the defendant deposited a forged cashier's check into his account. Additionally, the jury reasonably could have found that the check was made payable to and endorsed by a third party, the check was drawn on an out-of-state bank, the defendant made the deposit via a teller machine that was adjacent to a bank that was open for business at the time of the deposit and the defendant withdrew the $5000 from his account on the first day that the deposited funds became available for withdrawal pursuant to applicable regulations. Further, the jury reasonably could have found that after the withdrawal, the defendant did not respond to the bank's letter concerning the returned check, he stopped using his account, he did not respond to Lounsbery's telephone message concerning the incident and, on the eve of trial, he appeared before the bank manager in an attempt to demonstrate, solely for the purpose of his criminal trial, that he was making amends for his conduct.

Additionally, Lounsbery testified with regard to his considerable experience in cases such as the present

one involving persons who present fraudulent written instruments to banks in the guise of presenting valid negotiable instruments to obtain cash. He testified that persons who engage in this type of crime take advantage of the applicable banking regulations; they understand that the regulations typically require banks to make funds deposited by check available to depositors before such checks actually clear the bank or banks on which they are drawn. Lounsbery further testified that a general pattern of conduct is apparent in this type of case in that they typically involve a person's using a small amount of money to open an account at a bank, depositing a forged check via a teller machine rather than via a bank teller, withdrawing the funds made payable by the forged check as soon as possible before the transaction clears the bank on which it is drawn, ceasing to use the account after obtaining the funds at issue and failing to cooperate with police efforts to contact them concerning the transaction. Lounsbery opined that his investigation revealed that the defendant's conduct fit squarely within this specific pattern of criminal conduct.

On the basis of the evidence of the defendant's conduct, viewed in its entirety, the jury reasonably could have found that the defendant knew the check was a forged instrument. The defendant's conduct in opening and using the account until such time as he obtained the $5000, his failure subsequently to contact the bank within a reasonable time following the incident, his failure to respond to Lounsbery's telephone call and his visit with the bank manager, on the eve of trial, to begin making amends for the forged check all support an inference that he knew that the check was a forgery. Lounsbery's expertise in the area of bank fraud was relevant to the jury's understanding of the manner in which this type of crime is committed generally. That testimony bolstered the reasonableness of a finding that

the defendant not only knew that the check was a forgery, but that he possessed it with the intent of obtaining fraudulently $5000 from the bank.[4]

## II

To convict the defendant of larceny in the third degree, as the commission of that crime is alleged in the state's substitute information, the state bore the burden of proving beyond a reasonable doubt that (1) he committed larceny and (2) the value of the property involved exceeded $1000. General Statutes § 53a-124 (a) (2). "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." General Statutes § 53a-119. "Connecticut courts have interpreted the essential elements of larceny as (1) the wrongful taking or carrying away of the personal property of another; (2) the existence of a felonious intent in the taker to deprive the owner of [the property] permanently; and (3) the lack of consent of the owner." (Internal quotation marks omitted.) *State* v. *Hyde*, 104

---

[4] At trial, the state presented testimony from Mostowy, the bank manager. Mostowy testified that after the defendant deposited the check into the teller machine, a bank teller looked at the check the next day and placed a five day hold on the transaction, as was customary for deposits of checks drawn on out-of-state banks. The defendant argues that it was "inconceivable that [he] could have known that this . . . cashier's check was a forged instrument" because the bank teller, who physically had examined the check, failed to detect that the check was a forgery.

This argument is not persuasive for several reasons. First, although there was uncontradicted testimony that the teller did not identify the check to be a forgery at the time it was processed after its removal from the teller machine, there was no evidence that the bank teller who processed the check did so for the purpose of detecting forgeries or that the teller had any training or expertise in detecting forgeries. Second, the defendant's argument is based on the proposition that the fact that the teller did not detect the forgery at that time necessarily proved that the defendant did not know that the check was a forgery. There is no basis, either in fact or in logic, for this proposition.

Conn. App. 574, 578, 935 A.2d 639 (2007), cert. denied, 285 Conn. 910, 940 A.2d 809 (2008). "Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. . . . Larceny involves both taking and retaining. The criminal intent involved in larceny relates to both aspects. The taking must be wrongful, that is, without color of right or excuse for the act . . . and without the knowing consent of the owner. . . . The requisite intent for retention is permanency." (Citation omitted; internal quotation marks omitted.) *State* v. *Dell*, 95 Conn. App. 24, 28, 894 A.2d 1044, cert. denied, 278 Conn. 919, 901 A.2d 44 (2006).

The defendant does not claim that the state failed to prove that he took $5000 from the bank or that the bank did not consent to the taking of this money by means of a forged cashier's check. Instead, the defendant claims that the state failed to prove that he acted with the larcenous intent required by law. As was the case with the claim addressed in part I, there was no direct evidence of the defendant's state of mind. Accordingly, we look to circumstantial evidence of intent, such as the defendant's conduct, to determine whether the evidence reasonably permitted a finding that the defendant acted with the intent required for the commission of the crime. See id., 31.

In part I, we analyzed evidence of the defendant's conduct and concluded that it supported a finding that the defendant knew that the check was a forgery. This evidence encompassed the manner in which the defendant opened and used the account, his failure to contact the bank after the check was returned, his failure to respond to Lounsbery's telephone message as well as the defendant's visit to the bank on the eve of trial. We conclude that this evidence, viewed in its entirety and

in light of Lounsbery's testimony concerning the manner in which this type of bank crime is committed generally, amply supports a finding that the defendant intended to steal money from the bank and, thus, acted with a larcenous intent.

The defendant raises several arguments in support of his claim. First, he argues that he complied with bank rules and regulations and that the state based its case on the completely speculative proposition that he had specialized knowledge of the banking regulations concerning the availability of funds deposited in the form of checks. We observe that the state was not required to prove that the defendant had knowledge of these regulations. Any finding in this regard merely would have been incidental to the jury's ultimate finding concerning the defendant's intent.[5] To the extent that the state invited the jury to infer that the defendant acted with such knowledge, we conclude that such an inference was supported by the evidence. The state presented evidence that banks customarily provide new account holders with information about the regulations concerning the availability of deposited funds. Also, the state presented evidence that after the defendant deposited the forged check, he appeared at the bank at or about the earliest time at which the funds from the forged check were available for withdrawal. This circumstantial evidence, along with other evidence of the defendant's conduct, supported a finding that the

---

[5] "It is axiomatic that the state's burden of proof beyond a reasonable doubt applies to each and every element comprising the offense charged. But this burden of proof does not operate upon each of the many subsidiary, evidentiary, incidental or subordinate facts . . . upon which the prosecution may collectively rely to establish a particular element of the crime beyond a reasonable doubt. . . . Where the prosecution must rely upon circumstantial evidence, either in part or in whole, each link in the chain of circumstantial evidence need not be established beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Williams*, 220 Conn. 385, 398, 599 A.2d 1053 (1991).

defendant was aware of the applicable regulations and exploited these regulations to accomplish the crime of larceny.

Second, the defendant argues that the evidence demonstrated that once he became aware that the check, made payable to and endorsed by a third party, was a forged instrument, he voluntarily offered to repay the $5000. The defendant posits that his efforts in this regard demonstrate his "good faith" toward the bank. The jury reasonably could have viewed the evidence of the defendant's meeting with Mostowy in the manner suggested by the defendant. As we, however, evaluate the evidence in light of the jury's guilty verdict, we must evaluate the evidence consistent with a finding of the defendant's guilt. See *State* v. *Silva*, supra, 285 Conn. 454. The jury had before it evidence that the defendant did not contact the bank immediately after the forged $5000 check was returned, did not respond to the letter concerning the matter that the bank sent to the mailing address he provided the bank when he opened his account[6] and did not respond to the telephone message that Lounsbery left him. In fact, the evidence demonstrated that after using his account during the weeks prior to the transaction at issue, the defendant did not use his account following the withdrawal of the $5000.

---

[6] The defendant also attempts to cast doubt on the evidence that he had received the letter mailed to him by Eastern Federal Bank in November, 2005. The defendant calls our attention to a representation made to the court by the prosecutor, that, while Mostowy was certain that the letter was mailed to the defendant, she could not be certain that this letter was not returned to the bank. This representation of Mostowy, made to the court and the defense by the prosecutor, was not made in the presence of the jury and, thus, was not evidence in this case. Nevertheless, the jury had evidence before it that the bank mailed the letter to the defendant at the address that he provided the bank when he opened his account weeks earlier. There was also evidence that during his investigation, Lounsbery confirmed that this was the defendant's address. Accordingly, to the extent that the state based its case upon the defendant's failure to respond to the bank's letter, there was evidence in support of such a finding.

In light of all of this circumstantial evidence, the jury reasonably could have found that the defendant's conduct in speaking with Mostowy on the eve of trial did not reflect his good faith but his desire to gain some advantage with regard to the state's prosecution of charges related to his completed crimes. Accordingly, this evidence supports the jury's ultimate finding on an essential element of the crime, which is that the defendant acted with a larcenous intent.

The judgment is affirmed.

In this opinion the other judges concurred.